THE PEOPLE'S LAW FIRM, PLC
Stephen D. Benedetto (Ariz. Bar No. 022349)
645 North 4th Avenue, Suite A
Phoenix, Arizona 85003
Telephone: (602) 456-1901
Facsimile: (602) 801-2834
benedetto@the-plf.com

*Firm email for docketing purposes:*
admin@the-plf.com

*Attorneys for Plaintiffs Phil Martinez and Jorge Soria*

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Phil Martinez and Jorge Soria, | Case No. 2:21-cv-01212-DGC-MTM |
| Plaintiffs, | |
| v. | **AMENDED COMPLAINT FOR VIOLATION OF CIVIL RIGHTS (42 U.S.C. § 1983)** |
| City of Phoenix, a municipal corporation; | |
| Benjamin Moore, a City of Phoenix Police Officer, in his individual capacity; | |
| Douglas McBride, a City of Phoenix Police Officer, in his individual capacity; | |
| Joseph Gage, a City of Phoenix Police Officer, in his individual capacity; | |
| Darrell Magee, a City of Phoenix Police Officer, in his individual capacity; | |
| Jeffrey Miel, a City of Phoenix Police Officer, in his individual capacity; | |
| Erick Selvius, a City of Phoenix Police officer, in his individual capacity; | |
| Clifford C. Lewis, a City of Phoenix Police Officer, in his individual capacity; | |

Bobbi Jo Cozad, a City of Phoenix Police Officer, in his individual capacity;

Diana Pineda, a City of Phoenix Police Officer, in her individual capacity;

Defendants.

For their Complaint against Defendants Benjamin Moore, Douglas McBride, Joseph Gage, Darrell Magee, Jeffrey Miel, Erick Selvius, Clifford C. Lewis, Bobbi Jo Cozad, and Diana Pineda, Plaintiffs Phil Martinez and Jorge Soria, through their undersigned counsel, hereby alleges as follows:

## PARTIES, JURISDICTION AND VENUE

1. Plaintiff Phil Martinez is an unmarried man residing in Maricopa County, Arizona.

2. Plaintiff Jorge Soria is a man residing in Maricopa County, Arizona.

3. Defendant Benjamin Moore is a sworn police officer for the City of Phoenix, working and residing in Maricopa County, Arizona.

4. Defendant Douglas McBride is a sworn police officer for the City of Phoenix, working and residing in Maricopa County, Arizona.

5. Defendant Joseph Gage is a sworn police officer for the City of Phoenix, working and residing in Maricopa County, Arizona.

6. Defendant Darrell Magee is a sworn police officer for the City of Phoenix, working and residing in Maricopa County, Arizona.

7. Jeffrey Miel is a sworn police officer for the City of Phoenix, working and residing in Maricopa County, Arizona.

8. Erick Selvius is a sworn police officer for the City of Phoenix, working and residing in Maricopa County, Arizona.

9. Defendant Clifford C. Lewis is a sworn police officer for the City of Phoenix, working and residing in Maricopa County, Arizona.

10. Defendant Bobbi Jo Cozad is a sworn police officer for the City of Phoenix, working and residing in Maricopa County, Arizona.

11. Defendant Diana Pineda is a sworn police officer for the City of Phoenix, working and residing in Maricopa County, Arizona.

12. Every act and omission of the defendants, their representatives and agents detailed in this Complaint was performed under the color and pretense of the Constitutions, statutes, ordinances, regulations, customs and uses of the United States of America, the State of Arizona, and the City of Phoenix, by virtue of his authority as sworn police officers, and within the course and scope of their employment.

13. This Court has jurisdiction over this action pursuant to Article VI, section 14 of the Arizona Constitution and A.R.S. § 12-123. The amount in controversy exceeds the Court's minimum jurisdictional amount.

14. Venue is proper in this Court pursuant to A.R.S. § 12-401 insofar as the events that gave rise to Plaintiff's claim occurred in Maricopa County, Plaintiff resides in Maricopa County, and one or more of defendants are believed to reside in Maricopa County.

## **GENERAL ALLEGATIONS**

### The Tactical Response Unit

15. Until recently, the Phoenix Police Department maintained a team of officers that it held out as having "specialized training to deal with large protesting crowds."[1]

16. Known as the Tactical Response Unit, or "TRU," this unit receives

---

[1] https://www.phoenix.gov/police/glossary-of-terms

1  "specialized training" consisting of approximately 10 hours of training over the course of two days.

17. Upon information and belief, all or substantially all of the 10-hour training block provided to TRU officers focuses on protest-response formations—with no or substantially no meaningful training time dedicated to educating TRU officers on the First Amendment rights of demonstrators, or strategies and tactics for effecting the safe and lawful arrest of individuals in a non-violent protest environment.

18. Upon information and belief, the officers assigned to TRU consist at least partially of current and former PPD gang officers—at least some of whom have demonstrated histories of violence and excessive force, and others who have proven histories of dishonesty (including placement on the Maricopa County Attorney's Office's *Brady* list).[2]

19. From the dawn of the Movement for Black Lives in 2014, TRU has established a body of work that, upon information and belief, has been overtly hostile to the Movement for Black Lives, migrant rights organizations, and other caused perceived to be on the "left" of the political spectrum.

20. This has included, upon information and belief, the indiscriminate deployment of pepper bullets, tear gas, and mass arrest tactics that has resulted in multiple lawsuits, class actions, and investigations (both internal and external) into the propriety of TRU's protest-response tactics.

21. In early 2021, it was revealed that members of TRU designed, created, and distributed, commemorative "challenge coins" that included a political reference to Donald Trump, a direct homage to a Neo-Nazi logo, and celebration of violence against protestors (depicting a portrayal of a protestor that a TRU officer had previously shot in the testicles

---

[2] https://www.abc15.com/news/local-news/investigations/protest-arrests/prominent-activist-bruce-franks-jr-targeted-by-phoenix-police

with a tear gas cannister).[3]

22. Two years later, the City of Phoenix had not only failed to disband this unit, much less discipline any of its members for their misconduct, but, upon information and belief, had grown it—and assigned it to create and implement the response plan for a candlelight vigil.

### Lights for Liberty Candleight Vigil

23. On Friday, July 12, 2019, a group called "Lights for Liberty" coordinated hundreds of vigils nationwide to protest the inhuman conditions that migrants and refugees were being held in along the United States' Southern border.

24. Lights for Liberty was a self-described "coalition of people, many of whom are mothers, dedicated to human rights, and the fundamental principle behind democracy," which is "that all human beings have a right to life, liberty, and dignity." The group's stated mission was to partner with "international, national, regional, and local communities and organizations who believe that these fundamental rights are not negotiable and are willing to protect them."

25. The July 12, 2019 event in Downtown Phoenix was a peaceful one, and began at the Central United Methodist Church, who was hosting the affair. Attendees brought battery-operated tea candle lights and donations to be sent to migrant families in need.

26. Plaintiff Jorge Soria, a 62-year-old Arizona resident, attended the event to exercise his First Amendment to protest, and to stand in solidarity with migrant and refugee families.

### TRU Aggression Toward Protestors and Assault of Mr. Soria

27. Despite the fact that the vigil was a peaceful one, the evening took a quick turn as TRU reverted to aggressive tactics.

---

[3] *See* https://www.abc15.com/news/local-news/investigations/protest-arrests/video-uniformed-phoenix-sergeant-brags-about-coin-to-hate-group

28. Upon information and belief, TRU was supervised and led by Defendants Benjamin Moore (the TRU Lieutenant internally known as the "Alpha Leader") and Douglas McBride (the TRU Sergeant and leader of the unit's "grenadiers").

29. TRU declared the assembly "unlawful," despite the fact that there were no participants in engaging in or threatening violence.

30. Then, while giving conflicting orders to attendees – to either disperse and leave, or to get on to the sidewalk – TRU officers, adorned in full riot gear, began to assault the remaining vigil attendees who were peaceably assembled, shoving the front line of the group, already standing out of the roadway, back into other protestors.

31. In response to the acts of aggression, the protest largely disbanded and people began to leave (presumably to return home) after having witnessed TRU's violence and arrest of legal observer Jamaar Williams.

32. Some protestors remained, peacefully assembling out of the roadway on public lands and observing TRU's behavior.

33. During this time, an armed conservative counter-protestor named Tim Abbitt engaged with Phoenix PD, identified Mr. Soria—standing on the sidewalk and holding a former Soviet Union flag—and urged police to "arrest that commie!"

34. Mr. Soria was stopped by a reporter and asked to give an interview. He obliged and began to explain why he chose to attend the event: "I'm here to protest the way the police have militarized . . . and the way the Trump administration has gone with the police."[4]

35. As Mr. Soria gave the interview, Mr. Abbitt yelled at him.

36. Upon information and belief, Defendants Ben Moore and Doug McBride

---

[4] Video of Mr. Soria being interviewed, and ultimately assaulted, is incorporated herein by this reference and available at https://www.youtube.com/watch?v=h0JukNhaztc

ordered that his officers clear the area and arrest the remaining protestors—specifically, Mr. Soria and Mr. Martinez.

37. Upon information and belief, Sergeants Bobbi Jo Cozad and Joseph Gage assigned Officers Jeffrey Miel and Erick Selvius to effect Mr. Soria's arrest.

38. As Mr. Soria continued his interview, Officers Miel and Selvius sprinted at the 62-year-old man from a close distance, ripped the flag out of his hand, and tackled him to the ground – without ever announcing that he was under arrest, explaining what he was being arrested for, or giving him an opportunity to comply.

39. After the officers took Mr. Soria to the ground, a man (upon information and belief Mr. Abbitt) began celebrating, calling out "They got him! They got him!"

40. As the officers approached Mr. Abbitt, he began yelling to them "I'm on your side" and, upon information and belief, they ceased their pursuit of him.

41. The officers then handcuffed Mr. Soria behind his back, caused him to be transported to jail, and booked him into custody for unlawful assembly and obstruction of a public thoroughfare – both non-violent misdemeanors under Arizona law. Upon information and belief, both charges were summarily dismissed by Mr. Soria's initial appearance judge at the jail.

<u>Assault and Arrest of Phil Martinez</u>

42. At all times relevant to this complaint, Phil Martinez was a public critic of the Phoenix Police Department and police-reform activist in Phoenix who was, upon information and belief, well-known to Phoenix Police – in large part for his work filming abuse of police power and streaming it on his internet channel, Community Tap News.

43. On the night of July 12, 2019, Mr. Martinez was not working: He did not have his camera gear with him and was not attending the protest. He was initially just trying to pass through.

44. That night, Mr. Martinez was attempting to ride the light rail from Phoenix to Tempe to meet up with a group of friends. When his train came to a stop at Central Avenue and Thomas Road, the conductor instructed all passengers to exit, walk south to McDowell Road, and board if they wished to continue south and/or east.

45. Mr. Martinez began to walk southbound on Central Avenue's west sidewalk, towards McDowell Road. As he did so, he observed the last remnants of the candlelight vigil.

46. As Mr. Martinez approached, the police officers at the northwest corner of the intersection instructed him to cross the street—from the west side of Central Avenue to the east side of Central Avenue—where he would pass through what remained of the protest.

47. Mr. Martinez followed the officers' instructions and crossed the road. He observed the final few people remaining at the vigil: A reporter interviewing a man with a Soviet flag; a handful of people milling about; and a number of police officers still donning full riot gear.

48. Mr. Martinez began to make his way toward the interview that was happening with the Mr. Soria, observing a line of Phoenix Police officers in riot gear walking on the sidewalk. After a few seconds, he heard officers telling him to "get out of here" and turned around to begin to walk back north, per their instruction.

49. Almost as soon as Mr. Martinez turned away, he heard a commotion behind him and heard a man yell out "They got him! They got him!"

50. Mr. Martinez, who had extensive experience observing and filming police, immediately began to turn around to make his way to where the commotion was coming from to observe what was happening. As he looked back over his shoulder, he was immediately grabbed by several Phoenix Police officers—upon information and belief, Defendants Gage, Lewis, Magee and/or Pineda.

51. Without ever announcing that he was under arrest, explaining what he was being arrested for, or giving him an opportunity to comply, the officers twisted Mr. Martinez's arms behind his back, and slammed him against a temporary barricade.

52. As he was being dragged away, Mr. Martinez attempted to explain that the officers had made a mistake—he hadn't broken any laws or done anything wrong. He asked that he be able to speak to a sergeant to explain that he was taking the light rail and simply attempting to get through to the next stop as instructed by the conductor and numerous prior police officers.

53. A supervisor—upon information and belief, Sergeant Bobbi Jo Cozad—then responded to Mr. Martinez, specifically informing him that she recognized him from previous protests and that he was "going to jail."

54. After the event, Sergeant Joseph Gage falsely claimed that Mr. Martinez had assaulted him, and identified a photograph of Mr. Martinez from a photo lineup. Sergeant Douglas McBride falsely claimed he witnessed the assault.

55. Officers Gage, Cozad, Lewis, Magee and/or Pineda applied the handcuffs to Mr. Martinez's wrists to tight that his wrists immediately began to ache, swell, and lose sensation. He made numerous requests that the officers remove the handcuffs and they refused to do so.

56. Upon information and belief, the officers caused Mr. Martinez to be transported and booked into jail for unlawful assembly and obstruction of a public thoroughfare, despite having committed neither offense. Both offenses were non-violent misdemeanors under Arizona law and were, upon information and belief, were summarily dismissed by Mr. Martinez's initial appearance judge at the jail.

57. Notably, Phoenix Police officers did <u>not</u> arrest Mr. Abbitt, or the conservative counter-protestor that Mr. Abbitt would claim he was there to protect, Tim Gionet—both of whom remained present at the allegedly "unlawful" assembly in violation of the same

laws that Phoenix PD claimed to have arrested Mr. Soria and Mr. Martinez for violating.

**FIRST CLAIM FOR RELIEF**
**42 U.S.C. § 1983 – Retaliation in Violation of the First Amendment**
**(Plaintiff Soria Against Defendants Moore, McBride, Gage, Cozad, Miel, and Selvius)**
**(Plaintiff Martinez Against Defendants Moore, McBride, Gage, Cozad, Lewis, and Pineda)**

58. All other paragraphs of this Complaint are incorporated herein by this reference.

Plaintiff Soria

59. Plaintiff Soria engaged in protected activity under the First Amendment to the United States Constitution as set forth in ¶¶ 23-38 of this Amended Complaint.

60. In response to and because of these protected activities, Defendants Moore, Gage, Cozad, Miel, and Selvius acted in the manners described in ¶¶ 36-41 of this Amended Complaint.

61. Any reasonable person would be chilled or discouraged from engaging in further First Amendment activities based on the actions taken by Defendants Moore, Gage, Cozad, Miel, and Selvius against Plaintiff Soria.

62. As a direct and proximate result of the actions of Defendants Moore, Gage, Cozad, Miel, and Selvius, Plaintiff Jorge Soria was injured and is entitled to all available damages under the law, including but not limited to punitive damages for the officers' intentional and malicious conduct.

Plaintiff Martinez

63. As evidenced by the words of Sgt. Cozad, before the Lights for Liberty protest Plaintiff Martinez was known to Phoenix Police for his protected First Amendment activity as protestor, police observer, and independent media, as set forth in ¶¶ 42 and 53.

64. Though he did not originally attend the vigil to serve as a protestor or observer, after he realized what was happening Mr. Martinez did not merely "pass through"

but instead began to engage in protected police-observing activities, as set forth in ¶¶ 47-50.

65. In response to and because of these protected activities, Defendants McBride, Gage, Cozad, Lewis, Magee, and Pineda acted in the manners described in ¶¶ 30-32 of this Amended Complaint, retaliating against Plaintiff Martinez because of his actual or perceived First Amendment conduct.

66. Any reasonable person would be chilled or discouraged from engaging in further First Amendment activities based on the actions taken by McBride, Gage, Cozad, Lewis, Magee, and Pineda against Plaintiff Martinez.

67. As a direct and proximate result of the actions of Defendants McBride, Gage, Cozad, Lewis, Magee, and Pineda, Plaintiff Phil Martinez was injured and is entitled to all available damages under the law, including but not limited to punitive damages for the officers' intentional and malicious conduct.

**Supervisory Liability for First Amendment Violations**

68. At the time of the events set forth in this Amended Complaint Defendant Moore was, upon information and belief, the Lieutenant in charge of the protest response, known as "Alpha Leader" within TRU.

69. At the time of the events set forth in this Amended Complaint, Defendant McBride was, upon information and belief, a sergeant who, as the head of TRU's "grenadier" unit, served as Moore's "second in command."

70. Upon information and belief, Defendants Moore and McBride specifically ordered the arrests of both Plaintiffs Soria and Martinez.

71. As the leaders of TRU, Defendants Moore and McBride, upon information and belief, staffed the Unit with officers, dictated their training, organized and dictated the protest response, ordered use of force to clear the roadway, and ordered the surprise, unannounced arrest of legal observer Jamaar Williams earlier in the evening. In doing so,

Defendants Moore and McBride set into motion a series of acts by their subordinates that they knew or reasonably should have known would cause their subordinates to retaliate against Plaintiffs for exercise of their First Amendment rights.

72. Alternately, and at a minimum, Defendants Moore and McBride were aware that their subordinates were engaging in the above-described acts and failed to prevent their subordinates from engaging in such acts.

73. Additionally, as the leaders of TRU, Defendants Moore and McBride were aware that TRU officers were, upon information and belief, provided only 10 hours of training that focuses largely or exclusively on protest-response formations—and omits any meaningful training regarding First Amendment rights or effecting lawful arrests during an non-violent assembly.

74. Defendants Moore and McBride disregarded the known or obvious consequence that these particular training deficiencies and omissions would cause their subordinates to violate Plaintiffs' constitutional rights.

75. As a direct and proximate result of this deficient and inadequate training, Plaintiffs were deprived of their First Amendment rights, and were retaliated against for exercising those rights.

76. The actions of Defendants Moore and McBride as set forth herein were so closely related to the deprivation of Plaintiffs' First Amendment rights that they were effectively the moving force that caused their ultimate injuries.

**SECOND CLAIM FOR RELIEF**
**42 U.S.C. § 1983 –** *Monell* **Liability for Unconstitutional Practice or Custom**
**(Plaintiffs Martinez and Soria against City of Phoenix)**

77. All other paragraphs of this Complaint are incorporated herein by this reference.

78. As set forth above, the Defendants specifically retaliated against Mr. Soria and Mr. Martinez for exercising First Amendment rights—causing them to be physically

accosted and arrested while deciding not to arrest the similarly situated conservative counter-protestors.

79. As set forth herein, these actions were undertaken pursuant to an official policy of Phoenix to suppress the constitutional expressions of "the left."

80. These deprivations of Plaintiffs' First Amendment constitutional rights of the Plaintiffs were pursuant to a widespread or longstanding custom within Phoenix as demonstrated in ¶¶ 15-22 of this Amended Complaint, including but not limited to deficient training and supervision of TRU officers that amounts to deliberate indifference.

81. As a direct and proximate result of the policy or, in the alternative, the custom of the City of Phoenix discussed in this count, Plaintiffs Martinez and Soria were injured and entitled to all damages available under the law.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiffs Phil Martinez and Jorge Soria request that the Court enter judgment against Defendants as follows:

a. For compensatory damages (general and special) in an amount to compensate them fully and fairly for the violations of their Constitutional Rights;

b. For general, consequential, special, and compensatory damages, including but not limited to their pain and suffering, mental anguish, emotional suffering, and loss of enjoyment of life;

c. For nominal damages as provided for by law;

d. For punitive damages against all individual Defendants in an amount sufficient to punish defendants and deter them from similar unconstitutional and unlawful conduct in the future;

e. For prejudgment interest on all liquidated sums;

f. For attorneys' fees under 42 U.S.C. §§ 1983 and 1988;

g. For Plaintiff's costs and other expenses incurred in this action; and

h. Such other and further relief as the Court deems just.

## DEMAND FOR JURY TRIAL

Pursuant to Rule 38, Fed. R. Civ. P., Plaintiffs Phil Martinez and Jorge Soria hereby demand that this matter be tried to a jury.

DATED this 14th day of November, 2022.

                THE PEOPLE'S LAW FIRM, PLC
                645 North 4th Avenue, Suite A
                Phoenix, Arizona 85003

                By:/s/ Stephen D. Benedetto
                      Stephen D. Benedetto

                *Attorneys for Plaintiffs Phil Martinez and Jorge Soria*

## CERTIFICATE OF SERVICE

I hereby certify that on November 14, 2022, I caused the foregoing to be electronically transmitted to the Clerk's office using the CM/ECF System for filing and transmittal of a Notice of Electronic Filing to the following CM/ECF registrants:

Lori Berke, Esq.
Stacey Gottlieb, Esq.
Berke Law Firm
1601 North Seventh Street
Phoenix, Arizona 85006

*Attorneys for Defendants*

John Masterson, Esq.
Jones Skelton & Hochuli, P.L.C.
40 North Central Avenue, Suite 2700
Phoenix, Arizona 85004

*Attorneys for Defendant Ben Moore*

/s/ Stephen D. Benedetto
*An employee of The People's Law Firm, PLC*